**IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

FRANCIS E. CHARLES and
THERESA J. CHARLES,

Plaintiffs,

v.

LIMETREE BAY VENTURES, LLC; LIMETREE BAY HOLDINGS, LLC; LIMETREE BAY PREFERRED HOLDINGS, LLC; LIMETREE BAY REFINING, LLC; LIMETREE BAY TERMINALS (D.B.A. OCEAN POINT TERMINALS), LLC; EIG GLOBAL ENERGY PARTNERS, LLC; ARCLIGHT CAPITAL PARTNERS, LLC; ARCLIGHT ENERGY PARTNER FUND VI, L.P.; ARCLIGHT AIV, LP; EIG GLOBAL ENERGY PARTNERS, LLC; FREEPOINT COMMODITIES, LLC; and JOHN DOES 1-100,

Defendants.

**Case No.** 1:21-cv-260

**ACTION FOR DAMAGES AND INJUNCTIVE RELIEF**

**JURY TRIAL DEMANDED**

**CLASS ACTION**

# SECOND AMENDED CLASS ACTION COMPLAINT

## I. INTRODUCTION

1. The island of St. Croix, home to over 50,000 people, is the largest of the four major islands that make up the United States Virgin Islands, one of the most beautiful places in the world. St. Croix describes itself as being part of "America's Paradise," a place of an "eternal summer caressed by cooling tradewinds."[1]

2. The beauty of the island makes it a popular tourist destination spot, which helps to sustain the Virgin Islands economy. St. Croix also has a thriving agricultural industry that produces wholesome and healthy foods for the entire Virgin Islands.

[1] visitstcroix.com, (last accessed, May 26, 2021).

3. The Defendants, who owned and operated a "world class refinery"[2] called the Limetree Bay Refinery (hereinafter the "Refinery"), harmed the property and well-being of the people who live in St. Croix, as well as the island's tourist economy, by wrongfully emitting and discharging toxic substances, gases and odors including (but not limited to) oil, hydrogen sulfide, sulfur dioxide, polycyclic aromatic hydrocarbons, such as naphthalenes, other petroleum hydrocarbons, and other chemicals and particulates (hereinafter the "Toxins"). The location of the Refinery on St. Croix can be seen in the image below.




Sources: Limetree Bay Refining LLC; ESA Sentinel HANNAH DORMIDO/THE WASHINGTON POST

4. Years before Defendants took over the Refinery, it had been closed due, in part, to other environmental disasters that threatened the island's residents and its local economy. Upon Defendants' assurances that the Refinery could be refitted, operated and well maintained in an environmentally safe manner, the Refinery reopened in February of 2021.[3] Defendants assured the public that "[i]ndustry leading safety performance was maintained throughout the restart project."[4] Within four days of the Refinery's reopening, however, the first environmental disaster since the Refinery's reopening occurred, and numerous incidents have occurred since then, including the Refinery "shower[ing] oil on local residents twice, spew[ing] sulfuric gases into the surrounding area, and releas[ing] hydrocarbons into the air."[5] In May of 2021, the Environmental Protection

[2] limetreebayenergy.com, (last accessed May 26, 2021).
[3] https://www.limetreebayenergy.com/limetree-bay-ventures-commences-refinery-startup-operations/, (last assessed Dec. 15, 2022).
[4] *Id.*
[5] *Id.*

Agency ("EPA") shut the Refinery down, claiming that the Refinery's continued operation was an "imminent" threat to the health of people on the island.[6]

5. The consequences of these incidents have been swift and dire.

6. Particulate matter, harmful gasses and oily mists have been released into the air containing toxins, and visible droplets of oil have literally fallen from the sky onto the island and the people who reside there and settled on roofs and cistern systems.

7. According to the EPA, "[t]his … community has suffered through at least four incidents that have occurred at the facility, and each had an immediate and significant impact on people and their property."[7] Specifically, these incidents occurred on February 4, 2021, April 23, 2021, May 5, 2021, and May 12, 2021 (hereinafter the "Incidents")—and the Incidents caused harm to the Plaintiffs and the members of the putative Class.

8. As such, Plaintiffs, individually and on behalf of others similarly situated, bring this Action in order to seek adequate redress for the harm caused by the Defendant's Refinery and the operation of that Refinery. Plaintiffs and members of the putative Class seek injunctive relief, damages, and reasonable attorneys' fees due to the Defendant's violations of law.

## II. JURISDICTION AND VENUE

9. This Court has diversity jurisdiction pursuant to the Class Action Fairness Act, codified at 28 U.S.C. §§ 1332(d) and 1453 because the putative class consists of at least 100 Class Members; the citizenship of at least one Class Member is different from that of Defendants; and the amount in controversy exceeds $5 million, exclusive of interest and costs.

10. This Court has federal question jurisdiction over Plaintiffs' claims arising under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), pursuant to 28 U.S.C. § 1331 because those claims arise under a federal statute. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because those claims arise out of a common nucleus of facts with the federal claims alleged herein.

11. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this District and a substantial part of property that is the subject of this action is situated in this District. Venue is also proper

---

[6] *Id.*

[7] *Id.*

pursuant to 42 U.S.C. § 9613(b) because the unlawful releases and damages occurred within this District.

## III. PARTIES

12. **Named Plaintiffs and Class Representatives ("Class Representatives")** are citizens of St. Croix, United States Virgin Islands who live and/or work in communities adjacent to or located downwind from the Refinery, were harmed by the Defendants' Refinery and its operations, and suffered damages as a result.

13. Plaintiff Francis E. Charles has resided in Strawberry Hill, St. Croix, north of Limetree, since 1976.

14. Plaintiff Theresa J. Charles has resided in Strawberry Hill, St. Croix, north of Limetree, since 1976.

15. **Defendants.** Defendants ARCLIGHT CAPITAL PARTNERS, LLC, ARCLIGHT ENERGY PARTNER FUND VI, L.P., ARCLIGHT AIV, LP, EIG GLOBAL ENERGY PARTNERS, LLC, FREEPOINT COMMODITIES, LLC, LIMETREE BAY VENTURES, LLC, LIMETREE BAY HOLDINGS, LLC, LIMETREE BAY PREFERRED HOLDINGS, LLC, LIMETREE BAY REFINING, LLC, LIMETREE BAY TERMINALS, LLC (D.B.A. OCEAN POINT TERMINALS), and JOHN DOES 1-100 own and operate the aforementioned Limetree Bay Refinery which has caused harm to the Plaintiffs and the members of the putative Class.

16. Defendant Arclight Capital Partners, LLC ("Arclight Capital") is a direct or indirect member of the joint venture that owns and operates the Limetree Bay Facility. Arclight Capital shares this joint venture with Defendant Freepoint Commodities, LLC. Arclight Capital identifies itself as the "contractual investment advisor" to Defendant ArcLight Energy Partner Fund VI, L.P. and Defendant ArcLight AIV, LP ("AAIV"). Arclight Capital is a Delaware limited liability company with its headquarters located in Massachusetts. Arclight Capital avails itself to this Court by way of the fact that it does business in the United States Virgin Islands.

17. Defendant ArcLight Energy Partner Fund VI, L.P. ("AEPF") is a limited partnership with office and headquarters in Massachusetts. The citizenship of its members is unknown. AEPF previously held an ownership interest in Defendant Limetree Bay Preferred Holdings, LLC and currently holds an ownership in Defendant Limetree Bay Holding, LLC.

18. Defendant ArcLight AIV, LP ("AAIV") is a limited partnership with office and headquarters in Massachusetts. The citizenship of its members is unknown. AAIV previously held an ownership interest in Defendant Limetree Bay Preferred Holdings, LLC and currently holds an ownership in Defendant Limetree Bay Holding, LLC.

19. ArcLight Capital, AEPF, and AAIV are collectively referenced as "Arclight" in this Complaint.

20. Defendant EIG Global Energy Partners, LLC ("EIG") is a private equity company that purports to specialize in private investments in energy and energy-related infrastructure. Funds and accounts managed by EIG led the preferred equity portion ($550 million) of a $1.25 billion financing package that Defendant Limetree Bay Ventures secured in November 2018 to fund the restarting of the Refinery. EIG is incorporated in the State of Delaware with its principal place of business located in Washington, D.C. EIG does business in the U.S. Virgin Islands.

21. Defendant Freepoint Commodities, LLC ("Freepoint") is a member of the joint venture that owns and operates the Limetree Bay Facility. Freepoint shares this joint venture with Defendant Arclight Capital Partners, LLC. Freepoint is a Delaware limited liability company with its headquarters located in Connecticut. Freepoint avails itself to this Court by way of the fact that it does business in the United States Virgin Islands.

22. Defendant Limetree Bay Ventures, LLC ("Limetree Bay Ventures") is a holding company that consisted of Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC, and was owned by Arclight and Freepoint Commodities, LLC, during the time period giving rise to the incidents alleged in this Complaint. This Defendant is a Delaware limited liability company with its headquarters located in the United States Virgin Islands. This Defendant avails itself to this Court by way of the fact that it does business in the United States Virgin Islands.

23. Defendant Limetree Bay Holdings, LLC ("Limetree Bay Holdings") was the entity involved in purchasing the Limetree Bay Facility, which consists of the Limetree Bay Terminal and Limetree Bay Refinery (the "Limetree Bay Facility") out of the HOVENSA bankruptcy (defined below). Upon information and belief, at the time of the purchase of the Limetree Bay Facility, Arclight and Freepoint Commodities, LLC owned Limetree Bay Holdings. This Defendant is a Delaware limited liability company with its headquarters in the United States Virgin Islands. This Defendant avails itself to this Court by way of the fact that it does business in the United States Virgin Islands.

24. Defendant Limetree Bay Preferred Holdings, LLC ("LBPH") is a limited liability company. The citizenship of its members is unknown at this time. LBPH holds or held an ownership stake in Defendant Limetree Bay Ventures.

25. Defendant Limetree Bay Refining, LLC ("Limetree Bay Refining") was organized under the laws of the Virgin Islands and was doing business in the U.S. Virgin Islands at all times relevant hereto. Limetree Bay Refining was one of the entities responsible for operating the Refinery at the time of the toxic incidents referenced in this Complaint. Limetree Bay Refining filed for Chapter 11 bankruptcy on July 14, 2021, in the U.S. Bankruptcy Court for the Southern District of Texas (the "Limetree Bay Refining Bankruptcy"). Because of its prior bankruptcy, Limetree Bay Refining is a nominal defendant "for the purpose of (a) establishing Claims against the Debtors and their Estates, and (b) preserving rights with respect to insurance coverage for such Claims, if any, and for no other purpose." *In re: Limetree Bay Services, LLC*, *et al.*, No. 21-32351, Doc. 1454 (Bankr. S.D. Tex. 5/20/2022).

26. At the time of the toxic incidents referenced in this Complaint, Limetree Bay Refining was owned and/or controlled directly or indirectly by Arclight, EIG Global Energy Partners, LLC, and Freepoint Commodities, LLC, among others.

27. As of "the Effective Date, all of the Debtors' rights and their Estates' rights under any Insurance Policy to which the Debtors and/or the Debtors' Estates may have a claim or potential claim for coverage [] vest[ed] with the Liquidating Trust." *Id.* at p. 42.

28. As set forth in the Limetree Bay Refining Bankruptcy Court's May 20, 2022 Order Approving Disclosure Statement on a Final Basis and Confirming Chapter 11 Plan of Liquidation (the "Plan"), the Plan expressly preserves certain claims for Plaintiffs in this matter, as noted by the following exception contained in the "Release" section of the Plan:

> Notwithstanding anything to the contrary herein, the Insurance Claimants and their counsel may file, assert, and/or continue to assert their Claims and any putative class action litigation, including the Putative Class Action Litigation, against any of the Debtors as nominal defendants for the purpose of (a) establishing Claims against the Debtors and their Estates and (b) preserving rights with respect to insurance coverage for such Claims, and for no other purpose.

Plan at Section XIV. B., No. 21-BK-32351, ECF No. 1454. The term "Insurance Claimants" is defined in the Plan to include, among others, "all Named Plaintiffs and all Putative Class

Members in the Putative Class Actions" including the above-captioned matter. *Id*. at II. A.¶¶ 86, 145-146.

29. Defendant Limetree Bay Terminals, LLC (d.b.a. Ocean Point Terminals) ("Limetree Bay Terminals") is responsible for operating the Limetree Bay Terminal. This Defendant is a United States Virgin Islands limited liability company with its headquarters located in the United States Virgin Islands. Limetree Bay Terminals, LLC is owned by Arclight Capital Partners, LLC and Freepoint Commodities, LLC. This Defendant avails itself to this Court by way of the fact that it does business in the United States Virgin Islands.

30. Prior to the Limetree Bay Refining Bankruptcy, the ownership and organizational structure among the foregoing Defendants is set forth below:

31. Defendants John Does 1-100 are individuals or business or corporate entities incorporated in or doing business in St. Croix, United States Virgin Islands, whose true capacities are unknown to Plaintiffs, who therefore sue such Defendants by such fictitious names, and who will amend the complaint in this Action to show the true names and capacities of each such Doe Defendant when ascertained. Each such Defendant Doe is legally responsible in some manner for the events, happenings, and/or tortious and unlawful conduct that caused the injuries and damages alleged in this Action.

## IV. FACTUAL ALLEGATIONS

### A. Refineries

32. Refineries "separate crude oil into a wide array of petroleum products through a series of physical and chemical separation techniques. These techniques include fractionation, cracking, hydrotreating, combination/blending processes, and manufacturing and transport."[8]

33. According to the EPA, "[r]efineries in general emit a whole host of pollutants, ranging from nitrous oxides ("NOX"), sulfur dioxide ("SO2"), and carbon monoxide ("CO") to volatile organic compounds ("VOC"), hydrogen sulfide ("H2S"), and particulate matter "(PM")."[9] Additionally, the EPA has stated that "[e]missions … may include carbon particles (soot),

[8] *In the matter of Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC*, CAA-02-2021-1003 (E.P.A., Region 2) (May 14, 2021) ("*In re Limetree*").
[9] *Id.* at § 19.

unburned hydrocarbons, CO, partially burned and altered hydrocarbons, NOX and, if sulfur containing material such as hydrogen sulfide is flared, SO2."[10]

**B. The Limetree Bay Refinery**

34. Prior to the reopening of the Refinery, it was called HOVENSA[11] and was one of the world's largest oil refineries.

35. According to the EPA, "[t]he HOVENSA facility ("the facility") is located at Limetree Bay, St. Croix, U.S. Virgin Islands. It is a petroleum refinery covering 1,500 acres in what is known as South Industrial Complex, on the south central coast of St. Croix. Operations at the facility began in 1965 under HOVIC. On October 30, 1998, Amerada Hess Corporation, the parent company of HOVIC, and Petroleos de Venezuela, S.A. (PDVSA) formed a new corporation named HOVENSA LLC, which acquired ownership and operational control of the HOVIC facility. The facility's maximum design capacity was 545,000 barrels (1 barrel = 42 gallons) of crude oil per day. Over 60 different types of crude oil had been processed at the facility. By means of distillation and other refining processes, crude oil is separated into various components. Light ends (fuel gas) are sent to the facility's fuel system; naphtha, jet fuel, kerosene and No. 2 oil are further processed to remove sulfur."[12]

36. In 2012, HOVENSA closed after causing environmental disasters akin to those alleged herein, giving rise to violations of the Clean Air Act.[13]

37. The ventures which owned and ran the HOVENSA facility at that time decided to declare bankruptcy[14] ("HOVENSA bankruptcy") and subsequently shut the plant down rather than invest the $700 million in new pollution controls required by the EPA and the Department of Justice.[15] Accordingly, those pollution controls, as well as other necessary refurbishment of the Facility, were never done.

---

[10] *Id.* at § 23.
[11] https://www.epa.gov/hwcorrectiveactionsites/hazardous-waste-cleanup-hovensa-llc-christiansted-us-virgin-islands, (last accessed May 26, 2021).
[12] *Id.*
[13] https://www.justice.gov/opa/pr/nation-s-second-largest-refinery-pay-700-million-upgrade-pollution-controls-us-virgin-islands, (last accessed May 26, 2021).
[14] https://www.reuters.com/article/bankruptcy-hovensa/hovensa-faces-bankruptcy-owes-1-86-billion-to-owners-idUSL1N11N20A20150917, (last accessed May 26, 2021).
[15] https://www.justice.gov/opa/pr/nation-s-second-largest-refinery-pay-700-million-upgrade-pollution-controls-us-virgin-islands, (last accessed May 26, 2021).

38. Defendants were at all times aware that private cisterns are the primary source of safe, potable water for the residents of St. Croix. Thus, Defendants understood that if the Limetree Bay Facility was responsible for any further events that impacted cisterns on the island, this would effectively take away the only access to safe, potable water for residents of St. Croix.

### C. The Doomed Restart of the Limetree Bay Refinery

39. In or around January 2016, Defendants Arclight and Freepoint, through Limetree Bay Holdings, completed the purchase of the Limetree Bay Facility through a Section 363 Bankruptcy Sale in HOVENSA's bankruptcy. After the acquisition of the Limetree Bay Facility from HOVENSA, Dan Revers, the Managing Partner and co-Founder of Arclight Capital Partners, LLC, stated that "[c]losing on the St. Croix Facility represents the culmination of an innovative and complex transaction *executed by Arclight* in conjunction with its partner Freepoint."[16]

40. After their acquisition of the Limetree Bay Facility, Arclight and Freepoint then appointed Darius Sweet as Chief Executive Officer of Limetree Bay Terminals. Upon his appointment, Sweet emphasized how essential Arclight and Freepoint's support was for the proper operation and functioning of the Limetree Bay Facility. Sweet noted, "[w]ith Arclight and Freepoint's strong sponsorship, L[imetree Bay] Terminals will deploy significant investment to revitalize the St. Croix facility as a safety-oriented, environmentally compliant, multi-purpose energy center . . . ."[17]

41. In Defendant Arclight's own words, Arclight served as a "hands-on" owner and operator of the Limetree Bay Facility.[18] After the acquisition of the Limetree Bay Facility, Arclight confirmed its prominent role in the restart of the Refinery operations. Revers, the Managing Partner and co-Founder of Arclight, indicated that Arclight's involvement ". . . ma[de] full use of Arclight's suite of specialized capabilities including financial structuring, construction management, implementation of operational best practices, commodity management, human

---

[16] https://www.prnewswire.com/news-releases/arclight-capital-partners-and-freepoint-commodities-close-acquisition-of-st-croix-refinery-assets-from-hovensa-300201346.html, (last accessed Dec. 6, 2022) (emphasis added).
[17] https://electricenergyonline.com/article/organization/22989/567705/ArcLight-Capital-Partners-and-Freepoint-Commodities-Announce-Appointment-of-Darius-Sweet-as-Chief-Executive-Officer-of-Limetree-Bay-Terminals-LLC.htm, (last accessed Dec. 6, 2022).
[18] https://arclight.com/about/, (last assessed Dec. 6, 2022).

resources, and environmental management."[19] As evidenced by the horrific restart of the Refinery, however, Arclight's use of its "specialized capabilities" only served to create an unprecedented disaster generated by the implementation of the worst practices possible.

42. As to "environmental management," Defendants mismanaged nearly every aspect of environmentally safe operations for the Refinery. Among other federal and state environmental regulations and statutes, the Refinery is subject to the Clean Air Act and the Virgin Islands State Implementation Plan promulgated thereunder. The EPA previously issued a number of permits to HOVENSA pursuant to Title V of the Clean Air Act, which were subsequently transferred to the Limetree Bay Facility on or about March 9, 2016 and November 5, 2018.[20] These permits included all applicable requirements that were in effect during HOVENSA's operation.[21] In securing the transfer of these permits, Arclight leveraged its expert capabilities in "environmental management" to avoid a re-permitting process that would have revealed serious deficiencies in the Refinery. The grandfathering of the HOVENSA permits was essential to the doomed restart of Refinery operations, and Defendants' strategic actions amounted to an unprecedented level of environmental *mis*management.

43. In December 2020, the EPA issued an additional Clean Air Act pollution permit (the "Plantwide Applicability Limit" or "PAL" permit), pursuant to which the Refinery was required to install air monitoring equipment that HOVENSA had refused to install before filing for bankruptcy. However, the Refinery appealed those requirements, among others, arguing that the requirements were too strict and unneeded, and upon information and belief, never installed the air monitoring equipment on which issuance of the PAL permit was conditioned. Once again, Defendants bypassed safe environmental management that could have reduced the serious deficiencies in the Refinery and forged ahead in implementing blatantly unsafe environmental management practices.

44. As to "implementation of operational best practices," Defendants' operational practices were far from the "best." Instead, Defendants implemented the *worst* operational

---

[19] https://www.limetreebayenergy.com/limetree-bay-ventures-closes-1-25-billion-financing-to-restart-its-refinery-in-st-croix/, (last assessed Dec. 6, 2022).
[20] *See* https://www.epa.gov/vi/limetree-bay-terminals-and-limetree-bay-refining-llc, (last assessed Dec. 15, 2022).
[21] https://dpnr.vi.gov/wp-content/uploads/2019/07/Final-Major-EAR-Limetree-Consolidation.pdf, (last assessed Dec. 6, 2022).

practices possible. Defendants operated the Refinery as an oil storage facility until it resumed refining operations in early 2021. During that time, Defendants failed to adequately monitor and protect against the environmental harms caused by its storage operations. For example, on August 22, 2020, one of the Refinery's stormwater pumps failed as a result of heavy rainfall, and oil-polluted water overflowed into a containment pond and discharged into a nearby harbor. Further, the four releases that occurred in merely four months after the Refinery restart confirms that Defendants engaged in an egregious deviation from the "implementation of operational best practices," as proclaimed by Arclight.

45. As to "construction management," on February 1, 2021, the Limetree Bay Facility restarted refinery operations for the first time since its closure in 2012. Limetree Bay Terminals, LLC issued a press release dated February 1, 2021, stating, in pertinent part:

> **Limetree Bay Ventures Commences Refinery Startup Operations**
>
> ST. CROIX, U.S. Virgin Islands – February 1, 2021 – Limetree Bay Ventures, LLC ("Limetree" or "the Company"), a world-class refinery, terminal and logistics hub ***controlled by EIG Global Energy Partners ("EIG")***, today announced that Limetree Bay Refining ("the Refinery") has successfully resumed operations and begun production and commercial sales of refined products.
>
> The Refinery is capable of processing over 200,000 barrels of crude oil and other feedstocks per day ….
>
> Mr. Rinker continued, "***The restart of a refinery is a complicated endeavor, requiring a first-class team of employees and contractors*** and a collaborative partnership between business and government.[22]

46. Indeed, Defendants publicized that, "Limetree Bay Refining, LLC, restarted [refinery] operations in February 2021, and is capable of processing around 200,000 barrels per day. Key restart work at the site began in 2018, including the 62,000 barrels per day modern, delayed Coker unit, extensive desulfurization capacity, and a reformer unit to produce clean, low-

[22] Press Release, Limetree Bay Terminals, LLC, "Limetree Bay Ventures Commences Refinery Startup Operations" (Feb. 1, 2021), available at https://www.limetreebayenergy.com/limetreebay-ventures-commences-refinery-startup-operations/ (last accessed January 17, 2023) (emphasis in bold and italics added).

sulfur transportation fuels that will meet International Marine Organization ("IMO") standards required under international law in 2020."[23]

47. The Limetree Bay Facility, however, was obviously not properly refurbished and/or refitted to function in a safe manner as proclaimed. Within four days of its reopening, the first of four Incidents would occur at the Refinery—starting an unprecedented sequence of events that caused the harm and damage alleged herein.

**D. The Incidents Caused by the Limetree Bay Refinery**

48. The aforementioned Incidents occurred on February 4, 2021, in late April, 2021, on May 5, 2021, and on May 12, 2021—each of which caused harm to the Plaintiffs and the members of the putative Class.

**i. Incident One**

49. On February 4, 2021, Incident One occurred.

50. According to the EPA, "a mixture of oil and water, in the form of an oily mist, was emitted as air emissions from Flare #8 at the Facility (the "Feb. 4 Incident"). These emissions included liquid droplets of oil and other toxins. Limetree was aware of the impact this event had on the surrounding community and paid for various cleaning and decontamination work and provided bottled water to the community. In a March 3, 2021 press release, Limetree stated, "Limetree's environmental team was able to field verify the area impacted by the release, which was determined to be the Clifton Hill community."[24]

51. Additionally, the EPA stated, "[a]s of March 16, 2021, Limetree had reported to EPA that the Feb. 4 Incident resulted in 193 residences with potential contamination and 148 roofs and 245 cars that required cleaning. Samples were taken from 163 cisterns, and at the time, the results of 135 of those samples had been received."[25] Of those 135 cisterns, 70 were identified as contaminated. Many in the community nearby the Facility rely on cisterns for their household water use. A March 21, 2021 news article explained that "Ever since the refinery contaminated St. Croix's groundwater [under HOVENSA's prior operation], cisterns have become a necessity on

[23] https://www.limetreebayenergy.com/about-us/company-history/ (last accessed June 4, 2021).
[24] *In re Limetree*, ¶¶ 34, 37.
[25] *Id.* ¶ 38.

the island—catching rain to provide water for residents to drink, wash with or . . . irrigate their vegetable gardens."[26]

52. The Defendants ultimately admitted that the Incident occurred: "during an April 30, 2021, site visit to the Facility by staff from EPA…, Limetree representatives said that Limetree believes that the release was a mist with heavy oil in it."[27]

53. The EPA indicated that Incident One could have been caused by the Refinery's "knockout drums" that were "not designed with sufficient capacity."[28]

54. The EPA specified that "[t]his type of event is *not common* for a refinery startup."[29] In other words, this type of event is an unprecedented, egregious deviation of refinery operational norms all done under the control and direction of Arclight and Freepoint.

55. As a result of Incident One, the Plaintiffs and members of the putative Class suffered personal harm and harm to their property as a result of the Defendants' conduct.

56. According to the EPA, "[i]n early April, the Refinery stopped operations for a period of time due to undisclosed operational issues. Limetree Bay Refining stated in a letter to the EPA that the "refinery is shut down while we make operational adjustments."[30]

**ii. Incident Two**

57. In late April of 2021, Incident Two occurred.

58. Between April 19 and April 23, 2021, specifically, "Limetree reported … exceedances for the 162 parts per million ("ppm") emission standard for H2S concentrations … at the facility."[31]

59. The EPA stated, "H2S is a flammable, colorless gas that smells like rotten eggs. People can usually smell H2S at low concentrations in air when H2S concentrations are in the range of from 0.0005 to 0.3 ppm. Exposure to low concentrations of H2S may cause irritation to the eyes, nose, or throat. It may also cause difficulty in breathing for some asthmatics. Respiratory distress or arrest has been observed in people exposed to very high concentrations of H2S."[32]

---

[26] *Id*. at ¶ 38-39.
[27] *Id*. at ¶ 42.
[28] *Id*. at ¶ 44.
[29] *Id.* (emphasis added).
[30] *Id*. at ¶ 45.
[31] *Id*. at ¶ 46.
[32] *Id*. at ¶ 47.

60. From April 19-22, 2021, "hydrogen sulfide concentrations measured at the Flare #8 flare header rose to orders of magnitude above the limit of 162 ppm … High hydrogen sulfide readings on each of those four days, measured between 5 AM on April 19 and 5 PM on April 22, rose as high as 31,546.5, 39,475.7, 2,272.4, and 4,046.5 ppm, respectively[.]"[33]

61. Additionally, "Limetree continued to measure high levels of hydrogen sulfide in excess of the 162 ppm limit at the flare header for Flare #8 at the Facility during the evening of April 22 and into April 23, 2021. Hydrogen sulfide readings rose throughout the evening on April 22, 2021 and peaked at a three-hour average of 91,649.0 ppm around 11 AM on April 23—over <u>565 times higher</u> than the concentration limit of 162 ppm."[34]

62. In addition to the H2S release, the EPA confirmed the presence of "emissions plumes,"[35] which makes it highly likely that aerosolized oil droplets formed due to the chemical reaction with atmospheric constituents, including water.

63. According to the EPA, on April 24, 2021, the Virgin Islands Department of Health ("VIDOH") issued a press release alerting St. Croix residents to potential health effects from the Facility's Refinery emissions. It noted Limetree's confirmation of elevated hydrogen sulfide concentrations from Flare #8 and said that a "foul, gaseous smell, which can smell similar to rotten eggs, has permeated throughout the Frederiksted area for the past few days." It explained the potential health effects of breathing hydrogen sulfide, and encouraged residents to report symptoms such as headaches, nausea and symptoms of a respiratory nature to their healthcare providers.

64. On April 24, 2021, Limetree issued a press release denying any release of hydrogen sulfide occurred from April 22 to 23, 2021. Limetree claimed that the incident involved only an unusually high level of sulfur dioxide emissions, and that the odor of sulfur dioxide (similar to a struck match) can be smelled in amounts far below the level normally considered dangerous to health.

65. During an April 30, 2021 site visit to the Facility by staff from EPA and other regulators, "Limetree staff explained that the April 23, 2021 incident was related to the main sulfur recovery unit #4's fire eye detecting a lack of flame, and thus diverting the acid gas to the flare

[33] *Id*. at ¶ 49.
[34] *Id*. at ¶ 51.
[35] *Id*. at ¶ 62.

rather than treating it. The flare itself had a flame burning at the time that would have burned the hydrogen sulfide, producing sulfur dioxide."[36]

66. According to the EPA, "Limetree also does not conduct any fenceline monitoring for SO2 or H2S; it only conducts fenceline monitoring for benzene. Limetree's predecessor, HOVENSA, operated five SO2 monitors near the perimeter of the Facility, but those monitors have not been operated since 2013, after HOVENSA stopped operating the Facility's Refinery. Limetree has not restarted those SO2 monitors. On April 30, 2021, EPA issued a Notice of Violation to Limetree for its failure to operate the five SO2 monitors."[37]

**iii. Incident Three**

67. On May 5, 2021, Incident Three occurred.

68. According to the EPA, "On May 5, 2021, community members began calling EPA to report that an odor was emitting from the Facility. They described the odor as 'sulfur,' 'gassy,' 'burnt eggs,' and 'rotten.' On May 6, 2021, community members continued to report odor emitting from the Facility. At 7:08 PM EST, a citizen caller reported that the odor was continuing and described the fumes as 'noxious.' The caller also stated that the 'materials in the air were causing health problems' for community members, including 'head ache, sore throat, ear ache, nausea, and lips and tongue tingling.'"[38]

69. Despite these warnings, on May 5, 2021, Limetree issued an initial statement on Facebook once again "denying that there were any problems at the Facility." Limetree stated in its Facebook post that Facility personnel had conducted a preliminary investigation, and Limetree had concluded that "units are operating normally, and there is no activity that would result in an odor."[39]

70. That same day, Limetree admitted environmental violations the EPA and other agencies, in direct contradiction to its misrepresentations to the public. Per the EPA, "On May 5, 2021, Limetree environmental personnel reported to DPNR and EPA that the Facility had exceeded the H2S limit at Flare #8 at approximately 9 PM EST on May 5. At the time the email

[36] *Id*. at ¶ 58-60.
[37] *Id*. at ¶ 66.
[38] *Id*. at ¶ 69.
[39] *Id*. at ¶¶ 69, 71.

notification was sent to DPNR and EPA at 10:12 PM EST, Limetree environmental personnel stated that H2S was back below the limit."[40]

71. On the next day, May 6, 2021, Defendants released the following statement: "Limetree Bay has become aware of an odor affecting areas west of the facility. We are conducting maintenance activity at the Coker unit, which has resulted in light hydrocarbon odors. We will continue to monitor the situation, but there is the potential for additional odors while maintenance continues. We apologize for any impacts this may have caused the community. Thank you."[41]

72. On May 6, 2021, due to the noxious odor released by the Refinery, the U.S. Virgin Islands' Bureau of Motor Vehicles closed due to the presence of a "gas like odor."[42] On the same day, the Virgin Islands' Department of Education closed three schools.[43]

73. On May 7, 2021, Virgin Islands governor Albert Bryan "activated the … National Guard … to address continuing reports of odor and heightened concern from the community."[44] The government "advised residents with respiratory ailments to avoid going outside or to temporarily relocate to areas of the island that were less affected by the odors."[45]

74. On that same day, the Defendants reported to the EPA that yet another spike of H2S was released into the environment as a result of the Refinery and Defendants' operations thereof.[46]

75. Because of the visible plume, it is highly likely that aerosolized oil droplets formed due to the chemical reaction with atmospheric constituents, including water. These droplets then fell to the ground, contaminating Plaintiffs' and Class Members' residences, property and water supplies.

**iv. Incident Four**

76. On May 12, 2021, Incident Four occurred and constituted a release of oil droplets through the community.

77. According to the EPA, "[o]n May 12, 2021 at approximately 5:30 PM, Limetree reported to EPA that around 3:15 PM EST a flaring incident occurred at the Refinery when the

[40] *Id.* at ¶ 72.
[41] *Id.* at ¶ 73.
[42] *Id.* at ¶ 76.
[43] *Id.* at ¶ 75.
[44] *Id.* at ¶ 77.
[45] *Id.*
[46] *Id.* at ¶ 78.

pressure in the coker drum rose, causing fire or flames. At the time, Limetree was still unsure what specifically caused the flaring incident. Limetree reported that during its investigation of the fire, Limetree discovered that liquid droplets of oil were on the road west of the Facility."[47] "Liquid droplets of oil" were also reported on properties in the surrounding neighborhood.[48]

78. Additionally, "[a]t 8:50 PM on May 12, 2021, Limetree staff told EPA staff by phone that Limetree was stopping production after such a 'big' incident. This would not be a full shutdown of the Refinery, but Limetree would stop production. Limetree would run some units on circulation and the utilities/wastewater would still be in operation. The Limetree staff was not sure how long production would be suspended."[49]

79. The EPA once against indicated that "this type of event—let alone two such events in a few months—is *not common* for a refinery startup."[50] Or, in other words, such an incident was not common for an operation other than one controlled by Arclight and Freepoint.

**v. EPA Intervention**

80. After the Incidents, the EPA had no choice but to intervene.

81. On March 25, 2021, amid concerns raised by non-governmental organizations and members of the community, the EPA withdrew the PAL permit granted to the Refinery in December 2020, which had never gone into effect due to a number of appeals. Though the permit was withdrawn, the Refinery's operations were permitted to continue pursuant to the dozen other Clean Air Act permits issued to HOVENSA and transferred to the Refinery.

82. During a visit to the Refinery in April by the EPA, "Limetree representatives stated that Limetree has a single Environmental Department, known as the Health, Safety, and Environmental ("HSE") Department, serving the entire Facility, including the Refinery and marine loading terminal operations. In addition to managing environmental compliance at the Facility, the HSE department also oversees safety and implementation of COVID-19-related procedures. The entire HSE department consists of 5 employees. Limetree representatives noted they did have consultant support."[51]

---

[47] *Id.* at ¶ 79.
[48] *Id.*
[49] *Id.* at ¶ 84.
[50] *Id.* at ¶ 89 (emphasis added).
[51] *Id.* at ¶ 91.

83. The EPA, in response to this revelation stated, "[a] Refinery of this size and complexity would be expected to have 10-20 full time onsite staff in its health, safety and environment department."[52]

84. As such, the Defendants were not even adequately staffed to run a Refinery of this size—especially given the facility's history and proclivity to cause environmental disasters.

85. On April 30, 2021, the EPA issued a Notice of Violation to Defendants for Defendants failure to operate five sulfur dioxide ("SO2") ambient air monitors as required by one of the Clean Air Act permits issued to the Refinery.

86. As a result of the foregoing, the EPA (which decided to invoke emergency powers in order to do so) decided to shut the facility down temporarily—but the damage to the surrounding people, the island of St. Croix and the property on the island was already done.

87. Following the EPA intervention and subsequent bankruptcy of Limetree Bay Refining, West Indies Petroleum and Port Hamilton Refining and Transportation bought the Refinery in December 2021.[53] By September 2022, less than a year after ownership passed, the EPA conducted an inspection of the Refinery under new ownership and observed "significant corrosion" of equipment, including corrosion of vessels, piping and valves.[54] The deplorable state of the Refinery shows that it was in a similar deplorable state during the Refinery's previous brief operation and casts serious doubt that the restart was executed in any kind of safe or cautious manner.

**vi. The Disproportionate Effects of Defendants' Conduct on Minority Communities**

88. Plaintiffs and members of the putative Class were disproportionately harmed as a result of the Defendants' conduct alleged herein.

89. As the EPA has recognized repeatedly, "Limetree Bay is in a community predominantly made up of people of color and low-income populations who are already

---

[52] *Id.* at ¶ 92.

[53] https://www.reuters.com/business/energy/corrosion-st-croix-refinery-risks-explosion-catastrophic-releases-epa-2022-10-25/, (last visited Dec. 11, 2022).

[54] https://www.washingtonpost.com/climate-environment/2022/10/28/refinery-st-croix-epa-limetree/, (last visited Dec. 11, 2022).

disproportionately affected by environmental burdens," and "[t]hese disproportionate burdens present environmental justice concerns."[55]

90. Indeed, the EPA found that in the neighborhoods adjoining the Refinery, 27% of residents live below the poverty line and 75% are people of color, and the EPA concluded that "in light of the burden already experienced by the nearby low income and minority populations, [the EPA] is requiring Limetree to resume an ambient air monitoring network that will measure $NO_2$, $SO_2$ and $PM_{2.5}$." [56]

91. But Defendants balked at those requirements and refused to implement the necessary monitoring to protect these minority populations, as evidenced by the EPA's April 30 notice of violation to the Refinery for failing to install the monitors.[57]

92. This is not the first time that Defendant Arclight has exploited vulnerable communities of color—according to data analyzed by the University of Massachusetts, Arclight has incurred millions in penalties for environmental violations, with minorities accounting for more than 35% of the impact of those violations.[58]

93. This data shows that Arclight preys on communities of color, where environmental laws are underenforced, by refusing to implement the necessary protective and remedial measures in place to prevent harmful, toxic incidents—like those endured by Plaintiffs and Class Members—on the assumption that these vulnerable communities lack the resources to seek recourse for the harm caused by Arclight's exploitation.

## V. CLASS ACTION ALLEGATIONS

94. Class definition. Plaintiffs file this class action pursuant to Fed. R. Civ. P. 23 on behalf of a class of persons defined as:

> All persons who owned property (real and/or personal), and/or operated a business, and/or worked or resided on St. Croix and who have been harmed by the Defendants' conduct

[55] https://www.epa.gov/newsreleases/epa-notifies-limetree-bay-clean-air-act-violations (last accessed June 3, 2021).
[56] https://dpnr.vi.gov/wp-content/uploads/2019/07/Final-Major-EAR-Limetree-Consolidation.pdf (last accessed June 4, 2021).
[57] https://www.epa.gov/newsreleases/epa-notifies-limetree-bay-clean-air-act-violations (last accessed June 4, 2021).
[58] https://grconnect.com/tox100/ry2018/index.php?search=yes&company1=535&chemfac=chemfac&advbasic=adv&sortp=city (last accessed June 3, 2021).

> alleged herein from the date on which the Refinery Defendants acquired the Limetree Bay Facility through the present.

(hereafter, the "Class").

95. Alternatively, Plaintiffs bring this action on behalf of themselves and the following Sub Class, defined as:

> All persons who owned property, and/or operated a business, on St. Croix who sustained property damage and/or business losses as a result of Defendants' conduct alleged herein from the date on which the Defendants acquired the Limetree Bay Facility through the present.

96. Numerosity (Fed. R. Civ. P. 23(a)(1)). The Class, as defined in either paragraph 94 or paragraph 95 above, is so numerous that joinder of all Class Members is impracticable. The exact number of Class Members is unknown, but it is believed to be in the thousands.

97. Commonality (Fed. R. Civ. P. 23(a)(2)). There are numerous questions of law and fact common to the Class. Plaintiffs' claims on behalf of the Class arise from a single course of conduct by Defendants, presenting questions of law and fact common to the class, including (1) whether the noxious emissions from the complex are preventable; (2) whether the harms caused by the noxious emissions are preventable; (3) whether Defendants' conduct is intentional; (4) whether the resulting harms to property rights suffered by Plaintiffs and class area residents was foreseeable; (6) whether said harms are significant; (7) whether said harms are greater than the residents should be required to bear without compensation; (8) whether Defendant's conduct warrants punitive damages.

98. Typicality (Fed. R. Civ. P. 23(a)(3)). Plaintiffs' claims are typical of the claims Plaintiffs assert on behalf of the Class because Plaintiffs and members of the Class have sustained similar types of damages, and their claims arise from the same course of conduct and the same legal theories, as set forth in this Class Action Complaint.

99. Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)). Plaintiffs will fairly and adequately assert and protect the Class members' interests. No conflicts exist in the maintenance of this class action; Plaintiffs' interests are coincident with the interests of the Class.

100. Plaintiffs are determined to discharge their fiduciary duties to the Class members faithfully; they understand that they cannot settle this class action without prior Court approval; and they have retained experienced class action counsel, well-experienced in environmental class action litigation and with adequate financial resources to assure that the interests of the class will

be served. Class counsel are handling this matter on a contingent-fee basis, to be compensated for their services only as awarded by this Court.

101. Risk of Inconsistent Adjudications (Fed. R. Civ. P. 23(b)(1)). The prosecution of separate actions by Class members would create a risk of adjudications that could, as a practical matter, impair or impede the ability of Class members to protect their interests.

102. Fair and Efficient Method of Adjudication Claims and Defenses (Fed. R. Civ. P. 23(b)(3)). This class action will provide a fair and efficient method for adjudication of the Class members' claims and Defendant's defenses.

a. The common questions of law and fact outlined above, and others, predominate over any question(s) affecting individual Class members only. The evidence necessary to prove Defendant's course of conduct will be the same for every Class member.

b. Neither the size of the class nor any unusual legal or factual issues present management problems not normally and routinely handled in the management of class actions.

c. This forum is appropriate for litigation of this class action because Plaintiffs and all Class members are located here and Defendants conduct business here. In view of the complexities of the technical issues and expenses of litigation, the separate claims of individual Class Members for lost use and enjoyment of their properties are insufficient in amount to support separate actions. This class action is superior to other available methods for the fair and efficient adjudication of this controversy. The expense and burden of individual litigation effectively makes it virtually impossible for individual Class members to seek redress for the wrongs complained of herein.

## VI. CAUSES OF ACTION

### COUNT I

### NEGLIGENCE

103. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

104. The actions of Defendants were negligent.

105. Defendants owned and/or operated the Limetree Bay Refinery, and are responsible for its operations.

106. Defendants Arclight and Freepoint, were "hands-on" in the acquisition, rehabilitation, permitting, and operation of the Refinery. Through Defendants' Arclight and Freepoint's subsidiaries, including Defendants Limetree Bay Ventures, Limetree Bay Holdings, Limetree Bay Refining and Limetree Bay Terminals, Defendants bought the Limetree Bay Facility out of the HOVENSA bankruptcy, made repairs and retrofits to the Limetree Bay Facility, sought permitting and waiver of the significant HOVENSA fine levied by the EPA as a means to protect the St. Croix community, and operated the Refinery.

107. Defendants failed to properly store, use, refine, and/or dispose of oil and other Toxins.

108. Defendants failed to ensure that the refinery was safe to reopen when they knew or should have known it was not. Defendants also failed to hire and/or train personnel to conduct the reopening in a safe and effective manner.

109. Despite Defendant Arclight's acclaimed guidance on "environmental management," Defendants continued Refinery operations after the first, second, third *and fourth* Incidents. After each Incident, Defendants had the opportunity to comprehensively evaluate the safety of continued Refinery operations. Despite the clear warnings that the facility was not safe, and should not be operated, Defendants refused to close or limit operations and instead continued to serve their own profit motives. Any stateside refinery would have been immediately shut down after just *one* of these toxic incidents. The Refinery operations were not restricted until so ordered by the EPA—after the occurrence of *four* toxic incidents. Defendants not only failed to implement best practices; Defendants failed to adhere to any inkling of reasonable practices.

110. Defendants had a duty to area residents to exercise ordinary care to prevent foreseeable interference—here, by the release of offensive orders and noxious emissions—with the residents' use and enjoyment of their properties.

111. Defendants' conduct fell below the standard of care of a reasonable property owner and/or operator in similar circumstances.

112. Defendants breached said duty to exercise ordinary care by one or more of the following acts, omissions, or failures:

a. failing to reduce and control sulfur dioxide and other emissions from the refinery;
b. failing to reduce sulfur dioxide emissions by burning lower sulfur fuel oil;
c. failing to implement a program to investigate the causes of flaring incidents and take action to prevent it;
d. failing to create a preventive maintenance and operation plan for the sulfur recovery plant;
e. failing to replace leaking valves;
f. failing to monitor sulfur dioxide emissions by operating fence-line monitoring stations previously operated by HOVENSA;
g. failing to develop and/or maintain adequate policies and procedures as necessary to prevent the Plaintiffs' injuries;
h. failing to sufficiently reduce emissions of pollutants at the refinery and terminal storage facility upon restarting; and/or
i. otherwise failing to develop, design, construct, inspect, maintain, operate, control and/or engineer its refinery and terminal storage facility to prevent flares and uncontrolled releases of hydrogen sulfide, sulfur dioxide, VOCs, and other pollutants.

113. As a foreseeable, direct, and proximate result of one or more of Defendant's failures to exercise ordinary care, Plaintiffs' and Class members' properties have been invaded since the Limetree Bay refinery and terminal storage facility resumed operations.

114. Defendants knew and/or should have known that its failure to properly store, use, refine, and/or dispose of oil and other chemicals, toxins, and particulates at the Limetree Bay Refinery would allow these dangerous materials to contaminate nearby neighborhoods and cause their residents property damages, including but not limited to diminution in value.

115. Defendants failed to warn and/or provide Plaintiffs, the Class and the public at large with adequate and timely notice of the hazards and their potential impacts.

116. Defendants' negligence caused both real and personal property damage to Plaintiffs and Class Members.

117. As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and Class Members have suffered damages.

118. WHEREFORE, Defendants are liable in negligence to compensate Plaintiffs and Class Members for the lost use and enjoyment of their properties caused by Defendants' failures of duty, and for punitive damages.

**COUNT II**

**NEGLIGENCE PER SE**

119. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

120. The actions of Defendants as set forth herein constitute negligence per se.

121. Defendants have violated 28 V.I.C. §133 (Private Nuisance), 12 V.I.C. 201 (Virgin Islands Air Pollution Control Act), et seq., and 12 V.I.C. § 180, et. seq. (Virgin Islands Water Pollution Control Act).

122. The purposes of both statutes are to protect the interests of Plaintiffs and the Class Members.

123. As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and Class Members have suffered damages.

124. WHEREFORE, Defendants are liable in negligence to compensate Plaintiffs and Class Members for the lost use and enjoyment of their properties caused by Defendants' failures of duty, and for punitive damages.

**COUNT III**

**ABNORMALLY DANGEROUS CONDITION**

125. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

126. The actions of Defendants as set forth herein constitute maintaining an abnormally dangerous condition.

127. The Limetree Bay Refinery is located just south of certain residential communities, including the community in which Plaintiffs reside or work. Further the natural resources of the U.S. Virgin Islands are particularly sensitive and precious.

128. Defendants' use, storage, refining, and/or disposal of oil and other chemicals, toxins, and particulates was solely for Defendants' business purposes.

129. Defendants knew and understood that there was a high risk that the oil and other chemicals, toxins, and particulates could contaminate nearby neighborhoods and cause property damage to their residents.

130. Defendants' use, storage, refining, and/or disposal of oil and other chemicals, toxins, and particulates at the Limetree Bay Refinery did in fact cause serious harm to Plaintiffs' and Class Members' chattel and property, including both real and personal property.

131. As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and Class Members have suffered damages.

132. WHEREFORE, Defendants are liable in negligence to compensate Plaintiffs and Class Members for the lost use and enjoyment of their properties caused by Defendants' failures of duty, and for punitive damages.

## COUNT IV

### RESPONSE COSTS UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT

133. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

134. The Refinery is a "facility" within the meaning of 42 U.S.C. § 9601(9).

135. Each Defendant is (1) a current owner or operator of the Refinery; (2) a former owner or operator of the Refinery at the time the hazardous substances described herein were released; (3) a generator or other party who arranged for disposal of hazardous substances at the Refinery; or (4) a transporter of hazardous substances to the Refinery pursuant to 42 U.S.C. § 9607(a).

136. Defendants have allowed a "release" or "threatened release" of a hazardous substance from the facility within the meaning of 42 U.S.C. § 9607(a)(4), including but not limited to sulfur dioxide, hydrogen sulfide, volatile organic compounds, oil and other hazardous substances.

137. As a result of the release of hazardous substances from the Refinery, including sulfur dioxide, hydrogen sulfide, volatile organic compounds, oil and other hazardous substances, Plaintiffs and Class Members have incurred response costs consistent with the national contingency plan.

138. Plaintiffs and Class Members have suffered harm as a result of these releases.

139. WHEREFORE, Plaintiffs and Class Members entitled to declaratory judgment, injunctive relief, and response costs incurred as a result thereof.

**COUNT V**

**PUBLIC NUISANCE**

140. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

141. The actions of Defendants constitute a public nuisance as defined under 14 V.I.C. 1461§.

142. Specifically, Plaintiffs' and Class Members' homes have been damaged by Defendants' release of oil and other injurious chemicals, toxins, and particulates into their neighborhoods. However, the public at large has not endured such damages.

143. Plaintiffs and the Class are entitled to damages as a result thereof.

144. Moreover, Plaintiffs and the Class are further entitled to an injunction requiring Defendants to cease and desist all activities that result in the release of pollutants, and further to an injunction requiring Defendants to remove and remediate all pollutants that have been allowed to escape Defendants' premises.

145. WHEREFORE, Defendants are liable in public nuisance for damages to compensate Plaintiffs and Class Members for the lost use and enjoyment of their properties caused by the Defendants' failures of duty, to punitive damages, and to injunctive relief.

**COUNT VI**

**PRIVATE NUISANCE (UNINTENTIONAL)**

146. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

147. Defendants' conduct was negligent, reckless, or abnormally dangerous.

148. By so doing, Defendants have wrongfully and unreasonably interfered with Plaintiffs' and Class Members' private use and enjoyment of their homes and properties.

149. The interference caused significant harm to Plaintiffs' and Class Members' properties by creating conditions at said properties any reasonable person would find offensive, seriously annoying, or intolerable.

150. Moreover, Plaintiffs and the Class are further entitled to an injunction requiring Defendants to cease and desist all activities that result in the release of pollutants, and further to

an injunction requiring Defendants to remove and remediate all pollutants that have been allowed to escape Defendants' premises.

151. WHEREFORE, Defendants are liable in unintentional private nuisance for damages to compensate Plaintiffs and Class Members for the lost use and enjoyment of their properties caused by the Defendants' failures of duty, for punitive damages, and for injunctive relief.

**COUNT VII**

**PRIVATE NUISANCE (INTENTIONAL)**

152. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

153. Defendants' decision to operate their plant without controls and to continue operating their plant despite their inability to control emissions created nuisance-level conditions at Plaintiffs' properties and properties throughout the class area, unreasonably interfering with Plaintiffs' and Class Members' rights and privileges to use and enjoy their properties.

154. Defendants' conduct was the legal cause of the resulting harms.

155. The interference with the residents' property rights was substantial.

156. The interference was intentional, as the harms to the class area residents was substantially certain to result from Defendants' decisions to operate the refinery and tank farms without controls and to continue operating the refinery and tank farms despite its inability to control emissions.

157. The interference was unreasonable. The harms were serious, the financial burden of compensating Plaintiffs and others will not make continuation of Defendants' operation infeasible, and hence the harm resulting from the interference is greater than the residents should be required to bear without compensation.

158. Moreover, Plaintiffs and the Class are further entitled to an injunction requiring Defendants to cease and desist all activities that result in the release of pollutants, and further to an injunction requiring Defendants to remove and remediate all pollutants that have been allowed to escape Defendants' premises.

159. WHEREFORE, Defendants are liable in intentional private nuisance for damages to compensate Plaintiffs and Class Members for the lost use and enjoyment of their properties caused by Defendants' intentional conduct, for punitive damages, and for injunctive relief.

## COUNT VIII

## NEGLIGENT TRESPASS

160. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

161. Defendants' conduct was negligent, reckless, or abnormally dangerous.

162. By so doing, Defendants have wrongfully and unreasonably interfered with Plaintiffs' and Class Members' private use and enjoyment of their homes and properties.

163. Defendants' negligent, reckless, or abnormally dangerous operation of their refinery and terminal caused the uncontrolled emission of oil and noxious gases, which entered Plaintiffs' properties, including their water cisterns, as well as properties and cisterns throughout the class area. Plaintiffs did not consent to the entry of such oil and other substances onto their properties.

164. The entry of oil and noxious gases has caused significant harm to the homes, land, and water of the Plaintiffs and other Class Members.

165. Moreover, Plaintiffs and the Class are further entitled to an injunction requiring Defendants to cease and desist all activities that result in the release of pollutants, and further to an injunction requiring Defendants to remove and remediate all pollutants that have been allowed to escape Defendants' premises.

166. WHEREFORE, Defendants are liable in negligent trespass for damages to compensate Plaintiffs and Class Members for the entry of oil and other substances onto their properties, and for punitive damages.

## COUNT IX

## INTENTIONAL TRESPASS

167. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

168. Defendants' operation of their refinery and tank farm caused the uncontrolled emission of oil and noxious gases, which entered Plaintiffs' properties, including their water cisterns, as well as properties and cisterns throughout the class area. Plaintiffs did not consent to the entry of such oil and other substances onto their properties.

169. The entry was intentional, as the Defendants knew that it was substantially certain to result from their decisions to operate the refinery and terminal without controls and to continue operating the refinery and terminal despite their inability to control emissions.

170. Defendants are aware that they caused the emission and entry of oil and other substances but have failed to remove it.

171. Moreover, Plaintiffs and the Class are further entitled to an injunction requiring Defendants to cease and desist all activities that result in the release of pollutants, and further to an injunction requiring Defendants to remove and remediate all pollutants that have been allowed to escape Defendants' premises.

172. WHEREFORE, Defendants are liable in intentional trespass for damages to compensate Plaintiffs and residents throughout the class area for the entry of oil and other substances onto their properties, and for punitive damages.

## COUNT X

## VIOLATION OF THE VIRGIN ISLANDS AIR POLLUTION CONTROL ACT

173. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

174. Defendants' actions constitute a violation of the Air Pollution Control Act, 12 V.I.C. § 201, et. seq.

175. The Air Pollution Control Act's "declaration of purpose" indicates that it seeks "to promote health, safety and welfare" and "to prevent injury to human, plant and animal life, and property."

176. The purpose of the Air Pollution Control Act is to protect residents of the Virgin Islands from emissions of pollutants.

177. Plaintiffs and Class Members are among the class of persons the Air Pollution Control Act was meant to protect.

178. Defendants' discharge of oil and other chemicals, toxins, and particulates, into Plaintiffs' and Class Members' residences violated the Air Pollution Control Act.

179. As a result, Plaintiffs and the Class have been damaged as alleged herein.

## COUNT XI

## VIOLATION OF THE VIRGIN ISLANDS WATER POLLUTION CONTROL ACT

180. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

181. Defendants' actions constitute a violation of the Water Pollution Control Act, 12 V.I.C. § 180, et. seq.

182. The Water Pollution Control Act's "declaration of policy" indicates that it seeks "to promote health, safety and welfare" and "to protect, maintain and improve the quality thereof for public water supplies ... for domestic, recreational and other beneficial uses."

183. The purpose of the Water Pollution Control Act is to protect residents of the Virgin Islands from the discharge of pollutants into "any waters of the United States Virgin Islands."

184. Plaintiffs' and Class Members are among the class of persons the Water Pollution Control Act was meant to protect.

185. Defendants' unpermitted discharge of oil and other chemicals, toxins, and particulates, into waters of the Virgin Islands, including the August 2020 overflow resulting from the failure of the Refiner's stormwater pump, as well as Plaintiffs' and Class Members' cisterns and wells, violated the Water Pollution Control Act.

186. As a result, Plaintiffs and the Class have been damaged as alleged herein.

## COUNT XII

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

187. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

188. The actions of Defendants negligently inflicted emotional distress on Plaintiffs and Class Members.

189. Defendants owed Plaintiffs and Class Members a duty of care to ensure that they did not suffer from serious emotional distress, which duty arose by operating an abnormally hazardous condition, through the common law, and through statutory and regulatory obligations to prevent hazardous material from escaping from the Refinery.

190. Defendants breached their duty to Plaintiffs and the Class.

191. As a direct and proximate result of Defendants' breach, Plaintiffs and Class Members have suffered severe emotional injury.

192. As a result, Plaintiffs and the Class have been damaged as alleged herein.

## COUNT XIII

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

193. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

194. The actions of Defendants constitute the intentional infliction of emotional distress on Plaintiffs and Class Members.

195. In the Virgin Islands, a claim of IIED requires a showing that a party: (1) intentionally or recklessly; (2) engaged in extreme and outrageous conduct that exceeds all possible bounds of decency such that it is regarded as atrocious and utterly intolerable in a civilized society; (3) that caused the plaintiff to suffer severe emotional distress.

196. Defendants know and understand that exposure to discharge of oil and other chemicals, toxins and particulates and other particulates and hazardous substances presented and continues to present serious risks to the health and property of thousands of St. Croix residents.

197. Defendants knew that before Defendants' ownership, control, and operation of the Limetree Bay Refinery, the property was owned and operated by HOVENSA, LLC, a joint venture between Hess Corporation and Petroleos de Venezuela, the national oil company of Venezuela, and before that by HOVIC, a wholly owned subsidiary of the Hess Corporation formerly known as Amerada Hess.

198. Defendants knew that under HOVIC and HOVENSA, the Refinery exceeded allowable emissions of known harmful substances, including nitrogen oxide, sulfur dioxide, volatile organic compounds and benzene.

199. Defendants knew that in 2011, investigators discovered that the pipes carrying the Refinery's waste product had been corroding, slowly leaking more than 43 million gallons of oil into the island's largest aquifer.

200. Defendants knew that as a result of the massive leak, the EPA ordered HOVENSA to pay civil penalties of more than $5 million and to spend more than $700 million in new pollution controls to protect the public health and resolve Clean Air Act violations in St. Croix. The EPA required HOVENSA to implement new and upgraded pollution controls, more stringent emission limits and aggressive monitoring, and leak detection and repair practices to reduce emissions from refinery equipment and process units.

201. Defendants knew that instead of paying its fines and undertaking the required improvement projects, the Hess Corporation shut down the HOVENSA facility in 2012.

202. Defendants knew of the history of prior emissions at the Refinery and their impact on the community.

203. Defendants knew or should have known that the Refinery was not in a proper condition to reopen, and that the start-up would result in discharges and dangers to Plaintiffs and Class Members.

204. As a direct and proximate result of Defendants' actions, Plaintiffs and Class Members suffered severe emotional injury.

**COUNT XV**

**PIERCING OF THE CORPORATE VEIL AND ALTER EGO**

**(Against Defendants Limetree Bay Ventures, LLC; Limetree Bay Holdings, LLC; Limetree Bay Refining, LLC; Limetree Bay Terminals, LLC (d.b.a. Ocean Point Terminals); Arclight; and Freepoint Commodities, LLC)**

205. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

206. Plaintiffs ask that this Court pierce the corporate veil and find that Limetree Bay Refining—now insolvent and a nominal Defendant here—and Defendant Limetree Bay Terminals are jointly and severally liable with Defendants Limetree Bay Ventures, Limetree Bay Holdings, Arclight and Freepoint.

207. First, Limetree Bay Refining and Limetree Bay Terminals operated as mere alter egos of each other. For example, Limetree Bay Refining and Limetree Bay Terminals were parties to a Shared Services Systems Agreement ("Agreement") pursuant to which both entities "share[d] services (e.g., water, power, wastewater, etc.), facilities (e.g. on-site office space, employee housing, parking lots, etc.), employees, and insurance coverage."[59] Additionally, Limetree Bay Refining and Limetree Bay Terminals had a single Health, Safety and Environmental ("HSE") Department that served the *entire* facility. This sharing of services, assets and personnel resulted in an excessive comingling that far exceeds any norms that characterize a sister-company relationship.

[59] Declaration of Mark Shapiro in Support of Chapter 11 Petitions and First Day Motions at p. 9-10 ¶ 26, *In re Limetree Bay Refining*, No. 21-32351 (Bankr. S.D. Tex. July 12, 2021).

208. In addition to agreeing to share costs, employees and a HSE Department, Limetree Bay Refining and Limetree Bay Terminals also blurred all physical separation between the two entities by sharing property as well. The two entities reciprocally conveyed an undivided interest of all properties and facilities owned by each entity to the other entity, such that each entity "jointly own as tenants in common" all properties and facilities owned by both entities.[60]

209. Upon information and belief, Limetree Bay Terminals also siphoned funds from Limetree Bay Refining by way of charging Limetree Bay Refining nearly $5.5 million in "storage costs" each month for storage at a facility that both entities shared and co-owned.

210. Plaintiffs accordingly assert that the legal separateness of Limetree Bay Refining and Defendant Limetree Bay Terminals ceased to exist and that honoring the corporate fiction would result in an injustice.

211. Further, at various times between the purchase of the Refinery out of the HOVENSA bankruptcy and the restart of refinery operations in early 2021, Limetree Bay Ventures and Limetree Bay Holdings functioned as mere holding companies of Limetree Bay Refining and Limetree Bay Terminals. Limetree Bay Ventures and Limetree Bay Holdings served no separate existence or function outside of the corporate interests of Limetree Bay Refining and Limetree Bay Terminals.

212. Limetree Bay Ventures failed to maintain corporate formalities and acted as a mere alter ego of its subsidiaries, as evidenced by, upon information and belief, Limetree Bay Venture's: (i) maintenance of insurance coverage for the Refinery, (ii) lack of employees and (iii) shared officers with Limetree Bay Refining and Limetree Bay Terminals.

213. Upon information and belief, Arclight and Freepoint have a majority equity interest in Limetree Bay Ventures, which was the former parent company of Limetree Bay Holdings, and was the holding company of Limetree Bay Refining and Limetree Bay Terminals during the time period giving rise to this Complaint.

214. Upon information and belief, Arclight and/or Freepoint, through their investment and ownership in Limetree Bay Holdings, LLC, were the primary entities involved in the purchase of the Limetree Bay Facility and all negotiations with the EPA, including waiving fines from the

---

[60] *See* Objection and Reservation of Rights to Debtors' Emergency Motion for Entry of Interim and Final Orders at p. 5, *In re Limetree Bay Refining*, No. 21-32351 (Bankr. S.D. Tex. July 31, 2021).

HOVENSA environmental disaster and securing the issuance of permits to Limetree Bay Facility for operation. Arclight and Freepoint avoided a re-permitting process that would have revealed to the EPA serious deficiencies in the Refinery by securing grandfathered permits previously issued to HOVENSA. These actions were essential to the doomed restart of the Refinery.

215. Arclight and Freepoint dominated and controlled the Limetree Bay Facility through a mere corporate façade. Upon information and belief, Arclight and Freepoint were the primary entities responsible for capitalizing, and profiting from, the recommissioning of the Limetree Bay Facility. The entities operating the Limetree Bay Facility—Limetree Bay Ventures, Limetree Bay Holdings, Limetree Bay Refining and Limetree Bay Terminals—were set up as entities merely existing to create layers of separation between Arclight and Freepoint because of the history of environmental disasters at the Refinery. The separation of these entities is fictitious and an abuse of the privilege of incorporation.

216. Arclight and Freepoint woefully undercapitalized the refurbishment and recommissioning of Limetree Bay Facility, specifically the Refinery, for an undertaking of its magnitude. The entity's undercapitalization is evidenced by, among other things, the four significant environmental disasters that occurred in less than four months of operation (one occurring in the first four days of operation), the wholly inadequate staffing at the Refinery in the short time it operated, particularly in the HSE Department, and the Refinery's current deplorable condition. Arclight and Freepoint intentionally incurred risk that the Refinery would cause more environmental damage to the neighboring community, fully knowing that Limetree Bay Ventures, Limetree Bay Holdings, Limetree Bay Refining and Limetree Bay Terminals were undercapitalized and could not support such an operation.

217. Upon information and belief, Arclight and Freepoint were directly involved in the decision to continue Refinery operations after the first, second, third *and fourth* Incidents. After each environmental disaster, Arclight and Freepoint had the opportunity to comprehensively evaluate the safety of continued Refinery operations, as expected in operational best practices of environmental management. Despite the clear warnings that the facility was not safe, and should not be operated, Arclight and Freepoint refused to close operations and instead continued to serve their own profit motives. Any stateside refinery would have been immediately shut down after just *one* of these toxic incidents. The Refinery operations were not restricted until so ordered by the EPA—after the occurrence of *four* toxic incidents.

218. Based on the foregoing, Plaintiffs are entitled to a determination that the Defendants' corporate existence is a sham and that Defendants Limetree Bay Terminals, Limetree Bay Ventures, Limetree Bay Holdings, Arclight and Freepoint are each directly liable to Plaintiffs for the harms that occurred as a result of their purchase, undercapitalization, restart, operation and ownership of the Refinery.

**COUNT XVI**

**PUNITIVE DAMAGES**

219. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

220. From Defendants' acquisition of the Limetree Bay Facility to Defendants' formation and operation of the Facility, Defendants knew and understood the high risk that oil and other chemicals, toxins and particulates could contaminate nearby neighborhoods and cause residents' significant personal injuries and property damage.

221. Moreover, Defendants knew that the residents of the areas surrounding the Refinery are predominately low-income and people of color, who are already disproportionately affected by environmental burdens and that, as the EPA recognized, "[t]hese disproportionate burdens present environmental justice concerns." [61] Defendants are serial offenders in this regard—Arclight has incurred millions in penalties for environmental violations, with minorities accounting for more than 35% of the impact of those violations.[62] With the Refinery, Defendants acted with the same indifference to the livelihoods of the vulnerable, minority populations harmed by its operations. Although Defendants knew that the operation of the Limetree Bay Facility was unsafe, as evidenced by four environmental disasters in four months, including one occurring less than four days after the reopening of the Refinery, and despite communication from the government and residents of these concerns, Defendants continued to operate the Refinery to serve Defendants' own profit motives.

222. Defendants continued Refinery operations after the first, second, third *and fourth* Incidents. After each event, Defendants had the opportunity to comprehensively evaluate the safety of continued Refinery operations. Despite the clear warnings that the facility was not safe, and

[61] https://www.epa.gov/newsreleases/epa-notifies-limetree-bay-clean-air-act-violations (last accessed June 3, 2021).

[62] https://grconnect.com/tox100/ry2018/index.php?search=yes&company1=535&chemfac=chemfac&advbasic=adv&sortp=city (last accessed June 3, 2021).

should not be operated, Defendants refused to close or limit operations and instead continued to serve their own profit motives. Any stateside refinery would have been immediately shut down after just *one* of these toxic incidents, as such events are unprecedented for refinery operations. However, the Refinery operations were not restricted until so ordered by the EPA—after the occurrence of *four* toxic incidents. Defendants' failure to adequately assess the safety of continued operations demonstrates the worst practice imaginable in such a situation.

223. Defendants continuously failed to appropriately warn the public and publicly minimized serious chemical releases that endangered the health of Plaintiffs.

224. Defendants pursued this course of conduct with an evil motive or, at minimum, a reckless indifference to the injuries and damages that could be caused, meriting an award of punitive damages in an amount to be proven at trial.

**INJUNCTION TO SUPPLY WATER**

225. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

226. The water supply on St. Croix is limited and many people rely on cisterns at their homes or businesses to collect and access safe, clean, potable water for drinking and other uses such as bathing and cooking.

227. The actions of Defendants, or entities for which Defendants are responsible, contaminated with Toxins and contaminants the roofs and gutters and pipings that collect water for the cisterns and the cisterns and other sources supplying water to the residents of St. Croix, including Plaintiffs and Class Members.

228. Despite almost two years having passed since the toxic discharges, the Defendants or entities for which Defendants are responsible, have made little or no efforts to clean the roofs, gutters, piping, and clean and seal the cisterns or taken other actions to remedy the effects of the toxic discharges.

229. The residents of St. Croix, including Plaintiffs and Class Members, are still without adequate supply of clean, safe, potable water, as a direct and proximate cause of Defendants' actions.

230. In light of the harm caused by Defendants to the water supply in St. Croix, supposedly as a temporary solution, Defendants Limetree Refinery and Limetree Terminals agreed, in the Limetree Bay Refining Bankruptcy, to supply clean, safe, potable water to the residents of St. Croix pursuant to stipulation between Defendants and Plaintiffs.

231. Those Defendants have now breached that agreement, have failed to open distribution centers on numerous occasions, have decreased the amount of water from the agreed amount, and have shortened the agreed hours of distribution drastically, thus impairing the ability of Plaintiffs and other Class Members to have potable water.

232. Safe, clean, potable water is essential to human health and unless Defendants are enjoined by this Court to continue to provide an adequate supply of safe, clean, potable water to the residents of St. Croix, Plaintiffs and Class Members will be irreparably harmed by Defendants' contamination of the limited sources of water on St. Croix.

233. Further, the process of continuously having to drive to a location and wait in line every other day for a meager amount of water cannot continue and the underlying cause of the Plaintiffs' and other Class Members' inability to have to have potable water must be remedied expeditiously by providing the funds to do so.

234. Because Plaintiffs and Class Members are predominantly low-income residents of St. Croix, the imposition of any bond requirement would impose undue hardship on them, and such requirement should therefore be waived.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs, on behalf of themselves and the class, pray for relief as follows:

A. certification pursuant to Virgin Islands Rule of Civil Procedure 23 of a Class as defined Paragraphs 94 and 95 above;

B. An order naming Plaintiffs' counsel in each of the consolidated cases as lead counsel for this matter and any other related or consolidated matters;

C. judgment in damages against Defendants to compensate Plaintiffs and the Class Members for the loss of use and enjoyment;

D. judgment for punitive damages against Defendants.

E. prejudgment and post judgment interest as provided by law;

F. Injunctive relief requiring Defendants to supply clean, safe potable water to Plaintiffs, Class Members and other residents of St. Croix, remediate and restore the roofs, gutters, downspouts, cisterns, and other property contaminated by the Limetree Bay Refinery, and to provide the funds to rectify the inability for Plaintiffs

and the Class Members from being able to have potable water at their residents or businesses;

G. Declaratory judgment that Defendants are responsible for past and future costs to remedy the harm caused to Plaintiffs, Class Members and their properties;

H. Attorneys fees and costs pursuant to any applicable statutes and/or regulations; and

I. all further relief as the Court deems just and equitable.

**JURY TRIAL DEMAND**

Plaintiffs hereby demands a jury trial for all claims so triable.

Respectfully submitted,

**LAW OFFICES OF JOHN K. DEMA, PC.**
Attorneys for Plaintiffs

Dated: January 30, 2023

/s/ John K. Dema

JOHN K. DEMA, Esquire
1236 Strand Street, Suite 103
Christiansted, St. Croix, VI 00820
VI Bar Number: 357
Telephone: (340) 773-6142
Email: jdema@demalaw.com